**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


PAUL LOUGH,

      Plaintiff,

v.                               No. 2:16-cv-00338-JCH-SMV

BNSF RAILWAY COMPANY,

      Defendant.


## MEMORANDUM OPINION AND ORDER

While working as a conductor for his employer, BNSF Railway Company, Paul Lough injured his ankle after his BNSF-issued safety vest snagged a doorway bolt. Mr. Lough asserts liability for negligence under the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60 ("FELA") (1981 & Supp. 2018), maintaining that BNSF should have either provided him a vest that would not get snagged, or one that would rapidly "breakaway" if snagged. BNSF moved to exclude two of Mr. Lough's expert witnesses (ECF Nos. 82 and 83) and for summary judgment (ECF No. 84). Mr. Lough, in turn, moved to exclude trial evidence of collateral source benefits (ECF No. 81). After considering the motions, briefs, evidence, and relevant law, the Court rules as described herein.

## I.    __Factual Background[1]__

Mr. Lough was a Train, Engine and Yard ("TY &E") employee who worked as conductor within a locomotive cab. On April 28, 2013, while exiting the locomotive's front door, the shoulder opening of Mr. Lough's orange visibility vest snagged a bolt hinge on the door, causing

---

[1] Unless otherwise noted, the following facts are undisputed. Where there is a dispute of material fact, the Court presents that fact in the light most favorable to Mr. Lough.

him to step back and injure his left ankle. *See* Def.'s Mot. for Summ. J, ¶¶ 1, 2 ("MSJ"). In his personal injury report following the incident, Mr. Lough said that something in his ankle "popped … really hard and loud." *Id.* ¶ 3; Tr. of Statement of Paul Lough ("Lough Statement") 7:15-16, ECF No. 84-1. Mr. Lough's safety vest was issued to him by BNSF's Supervisor's Office in Amarillo, Texas. *See* Pl.'s Resp. Br., Additional Fact ("AF") ¶ A. The vest was a "zippered" or "non-breakaway" vest, as opposed to a "breakaway" vest. *See* Def.'s MSJ ¶ 4. Mr. Lough testified that in his career he had previously caught his vest in the same manner three or four times. *See* AF ¶ F.

Because of his injury, Mr. Lough sustained torn peroneus longus and peroneus brevis tendons in his left ankle. *See* AF ¶ PP, ECF No. 89. This led to a surgical repair of Mr. Lough's tendons in August 2013 and a total ankle arthroplasty in October 2015. *Id.*

**A. History of BNSF Issued Non-Breakaway Vests**

To better contextualize the facts of this case, the Court recounts the relevant Occupational Safety and Health Standard, a federal regulation also known as OSHA. Under OSHA, an employer like BNSF must assess and determine if worksite "hazards are present." 29 C.F.R. § 1910.132(d)(1) (West 2017). If so, an employer must provide to risk-exposed employees necessary "personal protective equipment" or "PPE." *Id.* The employer must "[s]elect, and have each affected employee use, the types of PPE that will protect the affected employee from the hazards identified in the hazard assessment." *Id.* § 1910.132(d)(1)(i).

Against this backdrop, BNSF issued non-breakaway vests to certain employees. Mr. Lough and BNSF employees Chris Followill and Audie Martin testified that a locomotive's cab is a confined space with narrow exits and protrusions such as door handles and bolts. *See* AF ¶ G. To travel in and out of a locomotive's doorway, Mr. Lough – who is 6'3'' and weighs 280

pounds – testified that, "you have to use every bit of room you've got in there" and that "it is not like you walk out that door and you don't brush up against the sides of it … [y]ou have to use every inch of that walkway that you can." Deposition of Paul Lough 118:21-25, ECF No. 89-1 ("Lough Dep."); AF ¶ I. In addition to Mr. Lough, four other BNSF workers stated that their non-breakaway vests snagged protrusions within the locomotive. *See* Deposition of Audie Martin 55:21-24, ECF No. 89-3 ("Martin Dep."); Deposition of Chad Griswold 64:21-23, ECF No. 89-5 ("Griswold Dep."); Deposition of Chris Followill 59:3-7, ECF No. 89-6 ("Followill Dep."); Deposition of Art Moffett 28:25-29:1, ECF No. 89-8 ("Moffett Dep.").[2] The non-breakaway vests hung loose. Lewis, Followill and Moffett testified that when their vests snagged on bolt hinges, they were performing their jobs in a non-rushed, attentive manner. *See* AF ¶ M. According to Griswold and Followill, the vest snagging incidents caused them to stumble or lose their balance. *Id.* ¶ O. Mr. Martin testified that other TY & E employees complained about the non-breakaway vests. *See* Martin Dep. 100:15-21. Additionally, Mr. Moffett testified that as local chairman he received complaints that the non-breakaway vests were "hang[ing] up on everything." Moffett Dep. 85:12-86. Mr. Moffett also testified that as local chairman he relayed to a superintended employees' complaints about non-breakaway vests catching on things. *Id.* ¶ Y.

**B. Change to Breakaway Vests**

In August 2010, BNSF promulgated rule S-21.1, which required employees to wear breakaway vests. *See* Deposition of Christopher Lewis 29:4-8 ("Lewis Dep."). No law,

---

[2] In his response brief, Mr. Lough contends that a fifth BNSF employee, Christopher Lewis, also testified that his non-breakaway vest snagged things. However, the cited portions of Mr. Lewis' testimony do not support this assertion. Although Mr. Lewis did testify that ten or 15 times his vest caught on a doorway bolt, he could not differentiate whether he wore a breakaway or non-breakaway vest.

regulation, or railroad standard mandated specifically the use of breakaway vests. *See* Def.'s MSJ ¶ 13; Deposition of Terence J. Fischer 98:6-20 ("Fischer Dep."). However, employees at three other Class I railroads[3] - Norfolk Southern Railway, CSX Transportation, and the former Consolidated Rail Corporation – stated that their railroad-employers provided them breakaway vests only. *See* July 3, 2018 Report of Terence J. Fischer, ECF No. 89-12 and 91-2 ("July 3 Fischer Report"). Moreover, one safety vest vendor only sold breakaway style vests to railroads. *Id*.

After BNSF introduced the breakaway vest rule in August 2010, reports soon followed that the company issued vests did not fit snugly and caught on door handles, armrests, cut levers, and other equipment. *See* Safety Issue Resolution Process Report ("SIRP"), ECF No. 84-8. BNSF employee Chris Followill testified that engineers and conductors complained about the breakaway vests catching on "everything," from "the refrigerator door as you walk up into the cab," to "older door handles in the bathroom." Followill Dep. 45:6-8; 56:2-4. At deposition, two BNSF employees testified that sometimes the Velcro on the vests failed to peel away and that if the vest hung on a door latch "it would just snag you and jerk you back." Griswold Dep. 53:3-4; Martin Dep. 80:6-9. As BNSF employee Chad Griswold testified, "the tear-away vests didn't tear away." Griswold Dep. 52:25 – 53:1. Mr. Griswold told Tom Hoffmeister, a Road Foreman, about his breakaway vest hanging up while exiting the locomotive. *Id*. 60:20-25. Mr. Lewis testified that when he looked up SIRP reports from 2009 to 2018, the only two employee safety complaints regarding vests concerned breakaway vests specifically. *See* Lewis Dep. 53:9-25 – 54:1-10.

---

[3] A Class I carrier has annual carrier operating revenues of $250 million or more. *See* 49 C.F.R. § 1201.1–1.

In March 2011, BNSF amended rule S-21.1 to remove the breakaway only requirement. *See* Followill Dep. 36:9-16, ECF No. 84-6. Under the amended rule employees could still wear vests; however, employees could also wear high visibility t-shirts, coats, jackets, or rain gear in lieu of the vest. *Id*. 36:25-37:1. As part of its "corrective action," BNSF proposed giving employees a monetary allowance to purchase their own PPE. *See* AF ¶ R. However, custom and practice by TY & E employees was to wear whatever safety clothing BNSF gave them. *See* Lewis Dep. 68:23-25:69-1-4; Followill Dep. 63:15-17. And employees were unaware that they could purchase their own PPE in lieu of wearing the BNSF issued vests. *See* Griswold Dep. 80:1-6. For example, Griswold testified that he never purchased a high visibility t-shirt because he thought BNSF had to purchase the t-shirts and that he "[did not] know where to get [one.]" *Id*. 61:12-14. Similarly, Mr. Lough testified that he wore whatever protective gear BNSF told him to wear. *See* Lough Dep. 156:9-17.

Mr. Followill testified that he "was very happy when we got rid of the breakaways," because they caught on everything. Followill Dep. 46:14-15. After the rule change, BNSF stopped providing the breakaway vests and employees were unaware that they could request one. *See* Moffett Dep. 48:13-14; 86:23-25 – 87:1-3. At the time of Mr. Lough's accident in 2013 few, if any, TY & E employees wore anything other than the non-breakaway vests. *See* AF ¶ T.

**C. Expert Testimony and Reports[4]**

**1. Terence J. Fischer's Reports, Deposition Testimony, and Affidavit**

---

[4] The Court recognizes that BNSF contests many of the conclusions of Mr. Lough's expert witnesses. The Court has included testimony and facts from the expert witnesses' reports and deposition for purposes of analyzing BNSF's motions to exclude their opinions. When considering BNSF's motion for summary judgment, the Court will only consider the admissible evidence.

To investigate the cause of Mr. Lough's injury, he retained the services of Terence J. Fischer, a certified expert in human factors engineering or ergonomics, which is the study of how man interacts with machines and how machines can be designed so that humans can use them more safely and efficiently. *See* Pretrial Order, ECF No. 103 ¶ 3 at 18. Mr. Fischer holds a master's degree in human factors engineering and a master's degree in the biomechanics of impact trauma. *See* Fischer CV, ECF No. 91-5 at 2. After completing his education, Mr. Fischer worked for 12 years in safety and system safety and consulted for the United States Air Force, Navy, Federal Aviation Administration, as well as General Motors Corporation. *See* Deposition of Terence J. Fischer 135:14-20, ECF No. 91-3 ("Fischer Dep.").

For 24 years he performed forensic human factors and accident reconstruction, which included performing accident and human factors analysis, accident scene inspections, and kinematics. *See* Fischer CV at 3. He is certified in human factors engineer and is a member of pertinent professional organizations, including the Human Factors and Ergonomics Society, American Society for Testing and Materials, American Society of Biomechanics, and the American Society of Safety Engineers. *See id.* at 1. Mr. Fischer prepared a report on May 30, 2017, an amended report on July 3, 2018, and he testified under oath. Following depositions by BNSF employees Martin, Lewis, Griswold, Followill and Moffett, Mr. Fischer reviewed those witnesses' depositions and filed a supplemental affidavit that is also in the record. *See* Affidavit of Terence J. Fischer, ECF No. 91-4 ("Fischer Aff."). As part of his investigation in this case, Mr. Fischer physically inspected and examined an exemplar locomotive wherein he measured and photographed the locomotive's doorway. *See* May 30, 2017 Report of Terence J. Fischer, ECF No. 91-1, 11 ("May 30 Fischer Report").

In his two expert reports, Mr. Fischer used the "typical human factors analysis" which he described at deposition as follows:

> we go through and we review the documentation we receive regarding the occurrence of the incident, the location of the incident, what actions were taken by the individual parties in the incident and what happened, then we, if we have the opportunity to, we go to the scene, we look at what happened, we take measurements, and then we apply our knowledge and experience and out databases, if necessary, on what a person would do in that environment and how they would operate to determine whether or not there was a violation of this safety that needed to be provided to that person.

Fischer Dep. 143:17-25 – 144:1-9. The typical human factors analysis methodology is used by others in Mr. Fischer's field of expertise. *See id.* 145:5-10. Upon inspecting an exemplar locomotive on May 12, 2017, in Amarillo, Texas, Mr. Fischer recorded that the door opening was

> 6 inches above the floor level … 22 inches wide … approximately 64 inches tall on the right side and 58 ½ inches on the left side. The door handle was 38 inches above the floor level. The bolt of the door latch was 54 inches above the floor level … the door opened 65 degrees … [and] [t]he maximum gap between the right side of the door frame and the latch and handle were 22 inches and 19 inches, respectively.

May 30 Fischer Report at 11.

Mr. Fischer researched what standards would apply to this case. *See* Fischer Dep. 145:21-24. He relied on BNSF rule books, including the Train Dispatcher's Operations, and Control Operator's Manual; BNSF Defect History; BNSF Locomotive Work History Report, and BNSF Photo Log. *See* May 30 Fischer Report at 3. He additionally examined the OSHA regulation concerning PPE and American National Standards Institute ("ANSI") industry standards. *See* Fischer Dep. 53:10-15. Mr. Fischer also relied on an American Society of Safety Engineers ("ASSE") report addressing workplace safety. *See* May 30 Fischer Report at 12. That report noted that an ANSI standard for high-visibility public safety vests "addressed the importance of

safety provisions for safety vests in workplaces, including breakaway construction to minimize the potential for 'catch and drag' incidents." *See id*. In addition, Mr. Fischer relied on his engineering references, and explained that he tries to identify applicable human factor elements or biomechanical issues present in any given case. *See id*. 136:21-25 – 137:1-2.

In his May 30, 2017 report, Mr. Fischer opined that "breakaway vests reduce injuries and save lives by allowing workers to get out of harm's way quickly" in case the vest gets trapped, pulled in or snagged by machinery, equipment or vehicles. May 30 Fischer Report at 12. Mr. Fischer said that peel force specifications for Velcro are about 0.6 to 0.7 pounds per linear inch or per square inch of force, meaning that "if you have a vest that has about 10 inches of Velcro on one of your seams, you're talking about 6 or 7 pounds force to be able to pull that apart." 56:16-25 – 57:1-3. However, Mr. Fischer conceded that "nobody has identified the force required" for a breakaway vest to break apart, and that he obtained the peel force specification of 0.6 to 0.7 per linear inch of force from the manufacturers' reported peel force specifications and that he conducted internet searches on the issue. 55:23:24; 56:25 – 57:1-3; 126:9-20.

Based on his experience in evaluating human movement and walking capabilities of a body in motion, Mr. Fischer opined that "[i]f you have a 290 -285 pound person walking about 3 to 4 feet per second, the forces on that are going to be significantly greater than what you see in the securing portions of a tear-away vest." 125:16-25126:1-8. To analyze Velcro peel strength Mr. Fischer watched manufacturer videos demonstrating "how easily these vests can be pulled off," and concluded that it would be easy enough to pull Velcro off a wearer "just by walking and catching on something." 131:12-20. Based on manufacturer's peel force specifications, Mr. Fischer opined that "tear-away vests are designed to be able to pull off a person easily … or to stop from their personal motion," and that breakaway vests with a manufacturer specific peel

force specification "are not going to stop a 300-pound man from walking if … his vest got snagged." 58:17-25 – 59:1-6; 60:10-25 – 61:1-6.

Mr. Fischer's inspection of the exemplar locomotive found that its door was 22 inches wide and that "[m]ost people are used to going through 36-inch doors," which he identified as a potential hazard. 136:14-20. Mr. Fischer did not attribute any fault to Mr. Lough for causing his injury. Noting the combination of Mr. Lough's larger than average size, lack of fault on his part, and the fact that he had to crouch through the doorway while carrying work equipment, Mr. Fischer opined that Mr. Lough's injury "could have been prevented … if he had used a vest that [was] designed to prevent him from snagging on [the bolt.]" 140:19-25 – 141:1-13. According to Mr. Fischer, the BNSF issued non-breakaway vest that Mr. Lough wore was unsafe for use for TY & E employees working in the confined environment of a locomotive since they would encounter protrusions into their walking space. *See* Fischer Aff. ¶ 23. Notwithstanding BNSF's abandonment of the breakaway vest requirement in 2011, BNSF should have required breakaway vests, Mr. Fischer opined. *See id.* 151:15-25 – 152:1-8. In his May 30, 2017 report, Mr. Fischer concluded to a reasonable degree of certainty that "the hazardous condition created by … [BNSF's failure] to require, issue and ensure that TY & E employees … were using breakaway style … vests in accordance [with] safety standards" caused Mr. Lough's injury and that had he been wearing a breakaway vest, his injuries could have been prevented. May 30 Fischer Report at 13.

In his second expert report on July 3, 2018, Mr. Fischer evaluated affidavit statements from eight current and former railroad workers at Class 1 railroads other than BNSF. Mr. Lough submitted into the evidentiary record the affidavit of one of the railroad employees, Ms. Patricia Hirkala Hans, who stated that she worked for 30 years for Conrail and Norfolk Southern

Railroads. *See* Affidavit of Patricia Hirkala Hans, ECF No. 91-8 ("Hirkala Hans Aff."). Part of her job was to hand out safety vests. *See id*. She reported that in her career she only distributed breakaway vests and that "a non-breakaway wasn't even available to order through our supply system, either at Conrail or Norfolk Southern." *Id*. Based on his review of the eight employees' affidavits, he found that the employees were only issued breakaway construction vests. *See* July 3, 2018 Fischer Report at 4. He opined that "[t]he failure [of] BNSF to only issue the breakaway style of vest did not meet the level of safety provided by other railroads and exposed its employees to a hazardous condition." *Id*. However, Mr. Fischer conceded that he was unaware of any railroad industry standard recommending or requiring tear-away vests. *See* Fischer Dep. 101:1-4.

Mr. Lough also submitted the affidavit from a former CSX Transportation and Conrail employee (this employee's affidavit was not part of Mr. Fischer's report), who supervised and purchased work equipment. *See* Affidavit of Raymond G. Harbison, ECF No. 91-9 ("Harbison Aff."). As the railroad's PPE purchaser, Mr. Harbison stated that the "three-piece breakaway type was the only style we were permitted to purchase." *Id*.

Finally, Mr. Fischer reviewed the depositions of BNSF employees Martin, Lewis, Griswold, Followill and Moffett that those men gave as part of this litigation. *See* Fischer Aff. ¶ 3. In an affidavit summarizing his review of the employees' statements, he concluded that they were issued vests that were too large or loose fitting and that the breakaway feature failed to release as needed; the arm holes on the BNSF vests were a catch point that created a hazardous condition; the men's vests routinely snagged protrusions in the train engine passageways; and that in light of the Human Factors and Safety standard the BNSF issued vests were hazardous. *See id*. ¶¶ 6-10.

## 2. Allen Parkman's Expert Reports and Deposition Testimony

Mr. Lough retained the services of Mr. Allen Parkman to provide opinions on Mr. Lough's financial losses stemming from his injury. Mr. Parkman is a Regents' Professor Emeritus of Management at the University of New Mexico, Anderson School of Management. *See* Parkman CV, ECF No. 90-4. He holds a Ph.D. in economics and a juris doctor. *See id.* Mr. Parkman authored two expert reports. *See* March 20, 2017 Report of Allen M. Parkman, ECF No. 90-1 ("March 20, 2017 Parkman Report"); June 8, 2018 Report of Allen M. Parkman, ECF No. 90-2 ("June 8, 2018 Parkman Report").

Mr. Parkman evaluated the total economic loss Mr. Lough incurred because of his ankle injury. *See* March 20, 2017 Parkman Report at 2. He his framework used two approaches – the "financial loss" and "value of life approaches," that he said is used by economists. *Id.*

### a. Financial Loss Approach

The financial loss approach estimates the amount of money necessary to compensate Mr. Lough for his injury. *Id.* The "loss" at issue consists of lost income, fringe benefits, and household services. *Id.* Mr. Parker opined that at the time of his injury, Mr. Lough had a life expectancy of 23 years, a work life expectancy of eight years, and that but-for the accident, he planned on retiring at age 62. *Id.*

In analyzing Mr. Lough's lost income, Mr. Parker noted that Mr. Lough's last salary with BNSF was $72,919. *Id.* at 3. Mr. Parkman assumed that as of January 2016, Mr. Lough could have performed the job of dispatcher with an annual salary of $24,540 based on Ms. Janet Toney's vocational opinion that Mr. Lough was capable of sedentary or light duty work with BNSF. *See* June 8, 2018 Parkman Report. Mr. Parker assumed that Mr. Lough's earnings would

raise 2.5% per year, which is consistent with the average annual increase in earnings during the past decade as determined by the Council of Economic Advisers. *Id*. at 3.

As for fringe benefits, Mr. Parker noted that because BNSF had a generous fringe benefits package not subject to income taxation, the fringe benefit loss equaled 25% of Mr. Lough's gross income loss. *Id*. Concerning household services – the loss of services Mr. Lough would have performed at home such as preparing meals, repairs, cleaning, gardening, childcare, and errands – Mr. Parker opined that Mr. Lough will have to pay someone to complete 10 hours per week of these services at the minimum pay wage. *Id*. Based on his calculations and assuming that he would retire at age 62, Mr. Parker opined that Mr. Lough's loss due to his accident was $363,920. *See* June 8, 2018 Parkman Report.

### b. The Value of the Enjoyment of Life Approach

In his report Mr. Parker stated that the financial loss approach described above is "only part of [Mr. Lough's] loss," and that his injury has limited activities he can participate in. March 20, 2017 Parkman Report at 4. Four activities – "the ability to enjoy the occupation of your choice," "activities of daily living," "social leisure activities," and "internal well-being," – "help us recognize that the enjoyment from activities usually exceeds the value just of their financial attributes." *Id*. Citing economic and government literature, Mr. Parker concluded that, adjusted for the change in the consumer price index, the median value for the value of a statistical life is $9.7 million in 2017, although his report did not conclude that this figure represented the value of Mr. Lough's specific enjoyment of life *Id*. at 5.

## II.     Procedural Background

On April 25, 2016, Mr. Lough filed a complaint in New Mexico federal court against BNSF under FELA, which provides a federal cause of action to railroad employees whose

injuries "result[] in whole or in part from the negligence of" the railroad. 45 U.S.C. § 51. *See* Compl., ECF No. 1. Mr. Lough alleged negligence by BNSF for, among other things, failure to use ordinary care to furnish Mr. Lough with a reasonably safe workplace to perform his job considering a dangerous condition; failure to warn him of the dangerous condition of equipment; failure to comply with applicable safety regulations concerning the maintenance of equipment; and failure to provide him proper equipment to perform his job. *See e.g. id.* ¶ 6(b), (c), (g), (i). The complaint alleged that BNSF's negligence directly and proximately caused Mr. Lough's injuries, and seeks personal injury damages in the form of past earnings losses and future earning capacity losses, past and future medical treatment expenses, and past and future pain suffering. *See id.* ¶¶ 7-10. Discovery lasted over one year. On October 8, 2018, BNSF filed the pending motions to exclude experts and for summary judgment, while Mr. Lough moved to preclude trial evidence of collateral source benefits.

## III.    Motions to Exclude

### A. Standard of Review

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods, and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2011). *See also 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006) (describing analysis as two-steps: (1) determining whether expert is qualified

and (2) whether the expert's opinion is reliable under *Daubert* principles[5]). The touchstone of admissibility under Rule 702 is helpfulness to the trier of fact. *See Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991).

A court should consider the following non-exhaustive and non-dispositive factors in determining whether particular expert scientific testimony is reliable: whether the expert's technique or theory can and has been tested; the theory has been subject to peer review and publication; the known or potential rate of error of the technique or theory when applied; the existence and maintenance of standards and controls; and the general acceptance of the methodology in the relevant scientific community. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999); *103 Investors*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593-94). The *Daubert* Court clarified that the focus must be solely on the principles and methodology, not on the conclusions they generate. *Daubert*, 509 U.S. at 595. With other non-scientific experts, "the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho*, 526 U.S. at 150 (emphasis added).

Expert witnesses may testify about ultimate issues of fact, but an expert may not state legal conclusions drawn by applying the law to the facts. *United States v. Richter*, 796 F.3d 1173, 1195 (10th Cir. 2015). Although an expert may not give an impermissible legal conclusion, an expert may give testimony that embraces an ultimate issue so long as the expert's testimony assists, rather than supplants, the jury's judgment. *Id.* (quoting *United States v. Dazey*, 403 F.3d 1147, 1171-72 (10th Cir. 2005)); *United States v. Schneider*, 704 F.3d 1287, 1293 (10th Cir. 2013) (stating that Rule 704(a) allows expert opinion on an ultimate issue so long as he explains basis for any summary opinion and does not simply tell the jury what result to reach).

---

[5] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

"Permissible testimony provides the jury with the tools to evaluate an expert's ultimate conclusion and focuses on questions of fact that are amenable to the scientific, technical, or other specialized knowledge within the expert's field." *Richter*, 796 F.3d at 1195.

Where an expert witness's testimony is based on his experience, the expert witness must explain how his experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *See United States v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009) (quoting Fed. R. Evid. 702 advisory committee's note (2000)). It is improper for a legal expert to supplant the court's duty to set forth the law and the jury's duty to apply the law to the evidence. *See Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988).

To determine whether an expert opinion is admissible, the district court performs the following two-step analysis: (1) the court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion, and (2) if the expert is so qualified, the court must determine whether the expert's opinion is reliable under the principles set forth in *Daubert*. *See 103 Investors I, L.P.*, 470 F.3d at 990. *Daubert*'s general holding setting forth the judge's gate-keeping obligation applies not only to testimony based on scientific knowledge, but also to testimony based on technical or other specialized knowledge. *Kumho Tire*, 526 U.S. at 141. Trial courts have equally broad discretion in both determining the reliability and admissibility of expert testimony and in deciding how to assess an expert's reliability, including what procedures to use in making that assessment. *See United States v. Velarde*, 214 F.3d 1204, 1208-09 (10th Cir. 2000). So long as the district court has enough evidence to perform its duty in assessing the relevance and reliability of an expert's proposed testimony, a hearing is not required. *See United States v. Call*, 129 F.3d 1402, 1405 (10th Cir.

1997). The proponent of the expert bears the burden by a preponderance of the evidence to establish that the requirements for admissibility have been met. *See Nacchio*, 555 F.3d at 1251.[6]

**B. Application to Mr. Fischer**

**1. Expertise**

BNSF challenges both Mr. Fischer's qualifications and methodology, stating that his testimony is "doubly unreliable because it does not arise from his specialty or expertise, nor does he provide a methodology to explain it." Def.'s Mot. to Exclude Mr. Fischer 7. BNSF concedes that Mr. Fischer is certified and trained in the field of Human Factors Engineering and Safety. However, BNSF contends that Mr. Fischer is not qualified to render an expert opinion because he "[1] has never worked for or been retained by a railroad … [2] nor does he have any case experience with safety vests." *Id.*

Mr. Fischer is qualified to render expert testimony. He is an engineer with 33 years of experience and board certifed in professional ergonomics, which evaluates the interaction between the human body and machines "to improve safety and performance." Fischer CV at 2. That he has never been an expert witness in a like case or developed experience with safety vests goes to the weight of testimony rather than its admissibility. "[A]s long as an expert stays within the reasonable confines of his subject area, … a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (quotation marks and citation omitted); *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243-44 (10th Cir. 2000) (admitting expert testimony from

---

[6] The record evidence is sufficient to enable the Court to perform its gatekeeping duty. Because it is a party's burden to request an evidentiary hearing, and none was requested, the Court will rule on the motion based on the briefs and evidence in the record. *See Nacchio*, 555 F.3d at 1253-56 (10th Cir. 2009) (explaining burden is on proponent of expert to request *Daubert* hearing).

ergonomist and safety consultant to opine on defects of machine that injured plaintiff where both experts were qualified experts in their fields and their testimony was within their fields of expertise, even though neither expert had firsthand knowledge of the machine) (citing *Daubert*, 509 U.S. at 592)).

### 2. Methodology

In analyzing a challenge to an expert's methodology, a "trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir.2004). "Although it is not always a straightforward exercise to disaggregate method and conclusion, when the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion." *Id*

BNSF first argues that Mr. Fischer's testimony is unreliable because it does not rely on calculations, simulations, or testing showing that a breakaway vest would have detached under the circumstances. Citing the *Daubert* reliability factors – testing, peer review, error rates, and acceptability in the relevant scientific community – BNSF argues that Mr. Fischer's methodology is not "scientifically valid." Def.'s Reply Br. at 5 (quoting *Daubert*, 509 U.S. at 590; 592-93). Mr. Fischer performed no "scientific studies or produced any actual calculations (that could be repeated) which support his conclusions"; never studied the vest involved in the incident; and never identified peel force specifications. Def.'s Reply Br., ECF No. 98, 2-3. According to BNSF, Mr. Fischer's opinions are speculative because he did not reenact the scene using a breakaway vest and measure the peel force strength – that is, the point at which the vest would have torn away from Mr. Lough's body without causing injury. Absent such data, BNSF

argues that there is no record evidence that a breakaway vest would have prevented Mr. Lough's injury. *See* Def.'s Mot. to Exclude Mr. Fischer at 2-3.

However, the reliability analysis articulated in *Daubert* is not always necessary for non-scientific expert testimony. "[A]lthough the trial judge must perform a gatekeeping role with respect to all expert testimony, not just such testimony by 'scientific' experts, … the reliability criteria enunciated in *Daubert* are not to be applied woodenly in all circumstances." *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009) (police officer's opinion on firearms in connection with drug trafficking admissible although not based on the *Daubert* reliability factors) (citations omitted). "[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 150). In the context of expert testimony by ergonomists specifically, a district court within the Tenth Circuit has permitted such testimony without reference to the *Daubert* factors. *See Corr v. Terex USA, LLC*, No. CIV.A. 08-1285-MLB, 2011 WL 976718, at *4 (D. Kan. Mar. 17, 2011) (*Daubert* factors did not apply to expert ergonomists' opinions based on experience, education, safety standards, reports, depositions, and knowledge of machines and his testimony was reliable even though he "made no calculations, performed no simulations, nor did he do anything else of a rigorous scientific nature.").

Here, sufficient facts and data support Mr. Fischer's conclusion that Mr. Lough's injury could have been prevented if he had been wearing a properly functioning breakaway vest. In addition to relying on his experience and education, Mr. Fischer referred to BNSF rule books, OSHA regulations, and an ASSE report discussing an ANSI standard. In all, Mr. Fischer relied on 26 different reference materials. Thus, Mr. Fischer's methodology is properly grounded in

published documents. One such document, an American Society of Safety Engineers report, noted that an ANSI standard for safety vests noted that breakaway construction vests minimize the potential for catch and drag incidents, thereby bolstering his methodology. *See Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1087-88 (10th Cir. 2001) (mechanical engineer's expert testimony reliable where his conclusion concerning defective condition was based on standard recognized by society of automotive engineers.).

In addition, Mr. Fischer used a post-accident "typical human factors analysis." That analysis is used by others in Mr. Fischer's field of expertise and involved reviewing documentation of Mr. Lough's accident, inspecting and measuring an exemplar locomotive, and applying his knowledge and experience to determine if there was a safety violation. Moreover, Mr. Fischer obtained peel force specification of 0.6 to 0.7 per linear inch of force from the manufacturers' reported peel force specifications, did internet searches on the issue, and watched videos produced by safety vest manufacturers showing breakaway vests easily breaking away. He extrapolated that a breakaway vest should easily break away if a person walked by something and caught it. That Mr. Fischer relied on his own internet research and manufacturers' self-reported data to obtain peel force strength goes to the weight of Mr. Fischer's testimony, not its admissibility.

BNSF further asserts that Mr. Fischer's testimony is unreliable because he relied on "hearsay" affidavits from eight employees from other Class I railroads who said that their employers provided them only breakaway vests.[7] BNSF argues that Mr. Fischer provided no

---

[7] Despite calling the affidavits hearsay, BNSF made no legal arguments or expressly raised a hearsay challenge. The Court therefore does not interpret BNSF's motion as making a hearsay challenge to the affidavits. Moreover, Fed. R. Evid. 703 "allows an expert witness to base his testimony upon facts or data that are hearsay, provided that those facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon

"synthesis" of the eight employees' statements and that he cannot opine on the railroad industry's custom and practice concerning safety apparel based on the eight affidavits. BNSF also believes that Mr. Fischer's opinions are further unreliable because he identified no federal law, rule, or railroad industry standard recommending the use of breakaway vests. Finally, BNSF asserts that Mr. Fischer's opinions are based on unproven factual assumptions – namely Mr. Lough's personal account of his injury.

True enough, BNSF is correct that Mr. Fischer points to no federal labor rule, regulation, or private railroad standard mandating the use of breakaway construction vests. But in FELA cases, a railroad's duty is to provide a reasonably safe workspace and therefore "[t]he standard of care is whether [BNSF] acted as a reasonably prudent employer, not whether it complied with any applicable regulations." *Aparicio v. Norfolk & W. Ry. Co.*, 84 F.3d 803, 811 (6th Cir. 1996), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000). *See id.* (stating that "[t]he fact that a regulatory body has not issued any applicable ergonomic standards does not relieve [the railroad] of its duty to provide a workplace safe from foreseeable conditions which might pose a danger to its workers."). Lack of a legal or industry mandate does not render Mr. Fischer's methodology unreliable.

Mr. Fischer properly relied on affidavits from other Class I railroad employees that all eight employees were exclusively issued breakaway vests. In the FELA context, this evidence is admissible. *See Rodriguez v. Delray Connecting R. R.*, 473 F.2d 819, 821 (6th Cir. 1973) (stating that "[e]vidence on the practices of other railroads is generally admissible in F.E.L.A. actions," and affirming district court's admission of evidence that other railroads provide employees an

---

the subject." *Wilson By & Through Wilson v. Merrell Dow Pharm. Inc.*, 893 F.2d 1149, 1153 (10th Cir. 1990) (internal quotation marks omitted).

automated spike remover rather than a manual maul and crowbar) (citing *Baltimore & Ohio RR. Co. v. Groeger*, 266 U.S. 521 (1925)). Finally, as part of his methodology Mr. Fischer permissibly drew on Mr. Lough's own version of events. *See Tormenia v. First Inv'rs Realty Co.*, 251 F.3d 128, 135 (3d Cir. 2000) ("Rule 702 does not require that experts … eschew reliance on a plaintiff's account of factual events that the experts themselves did not observe.").

However, the Court agrees with BNSF that Mr. Fischer may not extrapolate from these eight affidavits that railroad "custom and practice" is to issue employees breakaway vests. Such testimony would suggest that BNSF deviated from railroad custom. But Mr. Fischer has no qualifications or methodology to render such an opinion. This is the first case he has worked on involving breakaway clothing and safety vests and he has never been retained by or worked for a railroad. His CV is devoted to his education and experience in human factors engineering, and nothing indicates that he has any skills, training, or the like in railroad industry to offer an opinion about custom and practice. Mr. Fischer may tell the jury that as part of his analysis he reviewed affidavits from eight railroad employees and that all were issued breakaway vests. However, he may not tell the jury that this evidence suggests that railroad custom and practice is to issue employees breakaway vests. In sum, because no record evidence indicates that Mr. Fischer may reliably testify about railroad custom and practice, that portion of BNSF's motion to strike is granted.

### 3. Relevancy

Finally, BNSF argues that even if Mr. Fischer's testimony is reliable, it would not assist the trier of fact and thus irrelevant. "In assessing whether testimony will assist the trier of fact, district courts consider several factors, including whether the testimony is within the juror's common knowledge and experience and whether it will usurp the juror's role of evaluating a

witness's credibility." *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1136 (10th Cir. 2014) (quotation and citation marks omitted). "In doing so, courts must conduct a common-sense inquiry into whether a juror would be able to understand certain evidence without specialized knowledge." *Id*. Mr. Fischer's testimony will help the trier of fact. Courts have found testimony by human factors engineers relevant. *See e.g.*, *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243-44 (10th Cir. 2000); *Wright v. BNSF Ry. Co.*, No. 13-CV-24-JED-FHM, 2016 WL 1183135, at *8 (N.D. Okla. Mar. 28, 2016); *Corr,* 2011 WL 976718, at *4.

### C. Application to Mr. Parkman

Mr. Lough anticipates that Mr. Parkman will testify that (1) Mr. Lough's total financial loss was $363,920, and (2) provide testimony concerning "the value of enjoyment of life and relevant hedonic damages recoverable in New Mexico." *See* Pretrial Order, ¶ 5 at 33. BNSF does not challenge Mr. Parkman's qualifications. Rather, BNSF argues that (1) Mr. Parkman's financial loss calculations are unreliable and irrelevant because they are based on inaccurate factual assumptions and (2) expert testimony on hedonic damages is flatly prohibited for a variety of reasons.

#### 1. Financial Loss

BNSF argues under *Daubert* Mr. Parkman's "financial loss" approach is unreliable because he incorporated false assumptions into his analysis. Specifically, BNSF contests whether Mr. Lough was "totally disabled," and limited in his ability to perform housework and engage in hobbies such as hunting. BNSF also believes that Mr. Parkman's did not properly weigh Ms. Toney's finding in her vocational rehabilitation evaluation of Mr. Lough that he has problematic pre-existing health conditions. Moreover, BNSF contends Mr. Parker erred in applying the "typical person," analysis – although the Court is largely unable to perceive BNSF's argument

since it only states that "Mr. Lough does not represent the 'typical' person in stature or lifestyle," without explaining the context or import of this statement. Def.'s Mot. to Exclude, ECF No. 82 at 9.

BNSF's total *Daubert* analysis occurs in a single paragraph of its 10-page motion. The Court is unable to perceive the factual errors that BNSF complains of. Accordingly, the Court will not exclude Mr. Parkman from telling the jury about his financial loss evaluation. To the extent Mr. Parkman drew conclusions based on inaccurate assumptions, such assumptions "go to the weight, not the admissibility, of the testimony," and may be properly explored in cross-examination. Pl.'s Resp. Br. ECF No. 90 (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009)).

### 2. Hedonic Damages

BNSF seeks to exclude Mr. Parkman from about hedonic damages generally, and to specifically prevent him from testifying that the median value for statistical life in the United States is $9.7 million as of 2017. BNSF additionally argues that Mr. Parker's testimony concerning hedonic damages, and the hypothetical median value of human life about which he proposes to testify should be excluded as unreliable under the standards of Fed. R. Evid. 702 and *Daubert*.

Federal law, not state law, governs recoverable damages: "the proper measure of damages [under the FELA] is inseparably connected with the right of action, and therefore is an issue of substance that must be settled according to [federal law]." *Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 335 (1988) (citations and quotation marks omitted).[8] Typical practice in

---

[8] Mr. Lough argues that "New Mexico [law] clearly permits the recovery of hedonic damages in injury cases." Pl.'s Resp. Br. to Mot. to Exclude, ECF No. 90 (citing *Romero v. Byers*, 1994-NMSC-031, ¶ 17, 117 N.M. 422, 428, 872 P.2d 840, 846)). However, this is not a state law case.

New Mexico federal district court is to permit expert testimony explaining hedonic damages but exclude testimony quantifying hedonic damages. *See Walker v. Spina*, 359 F. Supp. 3d 1054, 1075-76 (D.N.M. 2019) (collecting six cases where the Court permitted an expert to testify on the general concept of hedonic damages, but not to quantify hedonic damages for the jury.); *see also Griego v. Douglas*, No. CV 17-0244 KBM/JHR, 2018 WL 1010277, at *2 (D.N.M. Feb. 20, 2018) ("The majority rule in this District holds that expert testimony that places a dollar in front of the jury in an attempt to quantify the value of a human life, is inadmissible … This rule would exclude testimony such as plac[ing] the reasonable range of the value of a statistical life … [and] numerical benchmarks for calculating present value of any lost value of life would be impermissible.") (citation and quotation marks omitted). The majority rule in this District also holds that expert testimony that attempts to quantify a human life routinely fails "the relevance and reliability factors set forth *Daubert* and its progeny." *Hart v. Corr. Corp. of Am.*, No. 211CV00267MCAWPL, 2014 WL 12670796, at *4 (D.N.M. May 6, 2014); *see also McGuire v. City of Santa Fe*, 954 F. Supp. 230, 233 (D.N.M. 1996) ("after the *Daubert* decision, courts have generally rejected expert testimony on hedonic damages.").

Consistent with this District's majority rule, the Court grants BNSF's motion to the extent that Mr. Parkman proposes to quantify hedonic damages by providing the jury with approximation that "the median value for the value of a statistical life is approximately … $9.7 million in 2017." Nor may Mr. Parker testify as to a hypothetical benchmark figure, reasonable range of the value of a statistical life in the United States, or any type of similar quantitative measure of the value of human life. *See Griego*, 2018 WL 1010277, at *2. However, the motion will be denied with respect to the proposed expert testimony regarding the general concept of

---

Mr. Lough asserted negligence under FELA and therefore federal law governs recoverable damages.

hedonic damages. *See Hart*, 2014 WL 12670796, at *5. *Flowers v. Lea Power Partners, LLC*, No. 09-CV-569 JAP/SMV, 2012 WL 1795081, at *4 (D.N.M. Apr. 2, 2012) (permitting expert "to offer generalized testimony about the concept of hedonic damages," but prohibiting expert from providing benchmark figures for hedonic damages).

In addition to giving generalized testimony about hedonic damages, Mr. Parkman may testify as to the four factors he utilized in valuing hedonic damages – specifically the effect that the injury had on "the ability to enjoy the occupation of your choice," "activities of daily life," social leisure activities," and "internal well-being." The Tenth Circuit permits expert testimony on these exact four "broad areas of human experience which [an expert] would consider in determining [hedonic] damages." *Smith*, 214 F.3d at 1246. This District likewise permits testimony on these valuation factors. *See Walker* 359 F. Supp. 3d at 1087 (permitting expert to "provide qualitative testimony defining hedonic damages and describing what factors to consider in making hedonic-damages valuations," but prohibiting expert from "quantify[ing] hedonic damages or provid[ing] benchmark figures for hedonic damages."); *Chavez v. Marten Transp., Ltd.*, No. CIV 10-0004 MV/RLP, 2012 WL 988008, at *2-3 (D.N.M. March 22, 2012) (admitting testimony on "(1) an economist's interpretation of the concept and meaning of hedonic damages; (2) the broad areas of human experience to consider in determining hedonic damages for a particular plaintiff, including how he spent leisure time and whether he participated in recreational activities, hobbies, or community activities," but not on figures quantifying hedonic damages). These same courts have found such generalized testimony admissible under the analysis set forth in *Daubert*. Much the same applies here.

IV.    **Motion for Summary Judgment**

      **A. Standard of Review**

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**B. Liability under FELA**

FELA provides that "[e]very common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. "Congress enacted the [FELA] after it determined the railroad industry owed a duty to its employees who daily expose themselves to extreme hazards." *Straub v. BNSF Ry. Co.*, 909 F.3d 1280, 1282–83 (10th Cir. 2018). "[T]he general congressional intent was to provide liberal recovery for injured workers." *Id.* (quoting *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432 (1958)). "Given that Congress intended FELA to be a broad, remedial statute, the Supreme Court has adopted a standard of liberal construction to facilitate Congress's objective of compensating railroad workers who are injured on the job." *Straub*, 909 F.3d at 1283.

The amount of evidence required to submit a FELA case to the jury is "significantly broader than the standard applied in common law negligence actions." *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1286 (10th Cir. 2018) (citation and quotation marks omitted). FELA is "an avowed departure from the rules of the common law" because of "the special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety." *Sinkler v. Missouri Pac. R. Co.*, 365 U.S. 326, 329 (1958). Even "doubtful" liability cases should be decided by juries. *Bailey v. Cent. Vermont Ry.*, 319 U.S. 350, 354 (1943).

"But, [a]s light as [the plaintiff's evidentiary] burden is, the plaintiff must still present some evidence of negligence ... specifically, the plaintiff must offer evidence creating a genuine issue of fact on the common law elements of negligence, including duty, breach, foreseeability, and causation." *Ruark v. Union Pac. R.R. Co.*, 916 F.3d 619, 625–26 (7th Cir. 2019) (citing *Tennant v. Peoria & P. U. Ry. Co.,* 321 U.S. 29, 32 (1944) ("[p]etitioner [is] required to present probative facts from which the negligence and the causal relation could reasonably be inferred.")); *Schaefer v. Union Pac. R.R. Co.*, 182 F.3d 933 (10th Cir. 1999) ("[T]he FELA plaintiff must prove the common law elements of negligence, including duty, breach, foreseeability, and causation.") (citation and quotation marks omitted). "That FELA is to be liberally construed, however, does not mean that it is a workers' compensation statute … FELA does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543-44 (1994) (internal citations omitted).

The Court now turns to the elements of Mr. Lough's claim – duty, breach, foreseeability, and causation – to determine if summary judgment in BNSF's favor is warranted.

**Duty and Breach**

The first element that Mr. Lough must demonstrate as part of his *prima facie* negligence case is the existence of duty. A railroad is charged with providing a reasonably safe work environment for its employees. *See Urie v. Thompson,* 337 U.S. 163, 179 n. 16 (1949) (stating that railroads have a duty to furnish employees with a "reasonably safe place in which to work and such protection in connection with his work against [the particular hazard causing the injury] as would be expected of a person in the exercise of ordinary care under those circumstances."). "[N]egligence, within the meaning of the [FELA]" exists if the defendant "knew, or by the

exercise of due care should have known, that prevalent standards of conduct were inadequate to protect [the plaintiff] and similarly situated employees." *Id*. at 178 (citation and quotation marks omitted). In its motion for summary judgment, BNSF correctly recognizes that "a railroad has a duty to provide its employees with a reasonably safe workplace; this does not mean that a railroad has the duty to eliminate all workplace dangers, but only the 'duty of exercising reasonable care to that end.'" Def.'s Mot. for Summ. J at 7 (citing *Baltimore & Ohio S.W.R. Co. v. Carroll,* 280 U.S. 491, 496 (1930) and *Van Gorder v. Grand Trunk W. R.R.*, 509 F.3d 265, 269 (6th Cir. 2007)). BNSF therefore does not dispute that it had a duty to exercise reasonable care to protect Mr. Lough. Mr. Lough has established the duty component of the negligence standard.

Mr. Lough must next establish that BNSF breached the applicable standard of care. Breach of duty occurs "when [a railroad] fails to use ordinary care under the circumstances or fails to do what a reasonably prudent person would have done under the circumstances to make the working environment safe." *Van Gorder*, 509 F.3d at 269 (citing *Tiller v. Atlantic C.L.R. Co.,* 318 U.S. 54, 67 (1943)). "That is, a railroad breaches its duty when it knew, or by the exercise of due care should have known that prevalent standards of conduct were inadequate to protect [the plaintiff]." *Van Gorder*, 509 F.3d at 269 (citation and quotation marks omitted). Mr. Lough's evidence raises a genuine issue of fact whether BNSF breached its duties under FELA to provide Mr. Lough safe equipment and thereby failed to provide him a safe working environment. The record contains testimony from crew members that BNSF issued to its employees non-breakaway vests that regularly snagged on things protruding from the confined space of a locomotive. Employees described the vests as loose hanging and snagging on things when the crew member performed their normal job duties. This same testimony by crew members suggests that they wore whatever safety clothing BNSF provided them. In addition, testimony from Mr.

Moffett, the local chairman, shows that he relayed complaints about the vests to a superintended. A reasonable jury could conclude from this evidence that BNSF was on notice that the vests it provided its employees were unsafe. In addition, the record contains two affidavits from employees at other Class I railroads that in their lengthy careers their railroad employers only supplied them breakaway vests, raising a jury question concerning whether BNSF's conduct was reasonable.

In addition to this lay testimony, Mr. Lough put forth expert testimony from Mr. Fischer that breakaway vests reduce injuries by allowing workers to get out of harm's way quickly and that Mr. Lough's injury "could have been prevented … if he had used a vest that [was] designed to prevent him from snagging on [the bolt.]" Fischer Dep. 140:19-25 – 141:1-13. A railroad's failure to provide suitable equipment or protective clothing gives rise to FELA liability. *See e.g. Harbin v. Burlington N. R. Co.*, 921 F.2d 129, 132 (7th Cir. 1990) (face mask); *Atchison, T. & S. F. Ry. Co. v. Preston*, 257 F.2d 933, 934 (10th Cir. 1958) (same). Accordingly, the expert and lay evidence in the record is sufficient to raise a jury question whether BNSF was negligent in failing to provide safe equipment and thereby created an unreasonably safe workplace. Mr. Lough has satisfied the breach of duty component of his negligence case.

**Foreseeability and Causation**

The third and fourth elements that Mr. Lough prove is that his injury was foreseeable, and that BNSF's conduct played a part in his injury. "[R]easonable foreseeability of harm is an essential ingredient of [FELA] negligence." *Gallick v. Baltimore & O. R. Co.*, 372 U.S. 108, 117 (1963). The "employer is not liable if it has no reasonable way of knowing that a potential hazard exists." *Schaefer*, 182 F.3d at 933. As to causation, "FELA's language on causation, … 'is as broad as could be framed.'" *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691 (2011) (quoting

*Urie,* 337 U.S. at 181). "Given the breadth of the phrase 'resulting in whole or in part from the [railroad's] negligence,' and Congress' 'humanitarian' and 'remedial goal[s],' [the Supreme Court has] recognized that, in comparison to tort litigation at common law, 'a relaxed standard of causation applies under FELA.'" *McBride,* 564 U.S. at 691-92 (quoting *Gottshall,* 512 U.S. at 542-43).

Under the relaxed FELA standard, "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Schulenberg,* 911 F.3d at 1286 (quoting *McBride,* 564 U.S. at 692); *see also Ruark,* 916 F.3d at 625 ("a FELA case should go to a jury if even the slightest of facts support a finding of negligence."); *Lynch v. Ne. Reg'l Commuter R.R. Corp.,* 700 F.3d 906, 911 (7th Cir. 2012) ("a trial court is justified in withdrawing ... issue[s] from the jury's consideration only in those extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of an employee.") (citation and quotation marks omitted).

BNSF contends that providing breakaway vests would not have prevented Mr. Lough's injury because they were were *less* safe than non-breakaway vests. BNSF points out that after it promulgated rule S-21.1, employees complained that the new breakaway vests fit too loosely, caught on equipment, and that "the breakaway vests didn't tear away." Griswold Dep. 52:25 – 53:1. BNSF argues that evidence of safer alternatives to completing work duties does not "render the chosen method unsafe or negligent for purposes of FELA," citing the district court's opinion in *McKennon v. CSX Transport, Inc.,* 897 F.Supp. 1024, 1027 (M.D. Tenn. 1995). In *McKennon,* the employee sued his employer under FELA, arguing that it should have provided him an automated machine to assist in driving spikes, rather than the sledgehammer-type device. *Id.* at

1025-26. The court granted summary judgment to the railroad. Because the spike maul was not defective, and the plaintiff used it safely for years, the court held that proof of a safer alternative was not proof of negligence and that "the proper inquiry is whether the method prescribed by the employer was reasonably safe." *Id*. at 1027.

But Mr. Lough's evidence raises a fact question whether the vest given to him was reasonably safe. A jury could conclude that BNSF employees wear whatever safety gear BNSF provides them to protect them from protrusions within the locomotive. Record testimony shows complaints about *both* the breakaway and non-breakaway vests catching on things, creating a question of fact whether the BNSF-issued vests were reasonably safe. Mr. Lough need not show that a breakaway vest would have been safer. He must only show that the one BNSF gave him was unreasonably safe. Additionally, Mr. Lough offered evidence from which a reasonable jury could conclude that BNSF was aware of the vest problems. Mr. Moffett relayed complaints to a superintendent about non-breakaway vests, and it is undisputed that BNSF knew about employee complaints concerning the breakaway vests when they were first issued. A reasonable jury could conclude that BNSF's purported negligence, even in the slightest, played a part in producing Mr. Lough's injury and that his injury was foreseeable. *See Ruark*, 916 F.3d at 625 ("a FELA case should go to a jury if even the slightest of facts support a finding of negligence."). In sum, BNSF's motion for summary judgment on Mr. Lough's FELA negligence claim is denied.

## V.     Motion in *Limine* to Exclude Collateral Source Benefits Evidence

Mr. Lough moves in *limine* to prohibit BNSF from offering trial evidence of "collateral source benefits" Mr. Lough received from the Railroad Retirement Board, any sickness benefits, supplemental sickness benefits, and a disability annuity. *See generally* Pl.'s Mot., ECF No. 81. Such evidence should be excluded, Mr. Lough says, "unless a plaintiff first 'opens the door' …

by making a claim of financial distress to arouse the sympathy of the jury." *Id.* ¶ 7. BNSF responded that it "does not plan to present any evidence of collateral sources of benefits Plaintiff may have received … unless Plaintiff opens the door to the admission of such information." Def.'s Resp. Br, ECF No. 92. Noting the parties' agreement on the issue, the Court grants the motion and prohibits BNSF from presenting collateral source benefit evidence unless Mr. Lough opens the proverbial door by making a claim of financial distress to improperly arouse the jury's sympathy.

## VI.  <u>Conclusion</u>

**IT IS THEREFORE ORDERED that** the pending motions are disposed of as follows:

1. Mr. Lough's Motion in *Limine* to Exclude Collateral Source Benefits Evidence **[ECF No. 81]** is **GRANTED** as described herein;

2. BNSF's Motion to Exclude the Expert Testimony of Plaintiff's Expert Alan Parkman **[ECF No. 82]** is **GRANTED** in part and **DENIED** in part as follows:

   - BNSF's request to exclude Mr. Parkman from quantifying hedonic damages is **GRANTED**. Mr. Parkman may testify generally about hedonic damages, including explaining hedonic damages to the jury and describing what factors are relevant to valuing hedonic damages;

   - In all other respects, BNSF's motion to exclude the testimony of Mr. Parkman is **DENIED**;

3. BNSF's Motion to Exclude the Expert Testimony of Plaintiff's Expert Terence Fischer **[ECF No. 83]** is **GRANTED** in part and **DENIED** in part as follows:

   - BNSF's request to exclude Mr. Fischer from opining about railroad custom and practice is **GRANTED**;

In all other respects, BNSF's motion to exclude the testimony of Mr. Fischer is **DENIED**;

BNSF's Motion for Summary Judgment **[ECF No. 84]** is **DENIED**.

 **IT IS SO ORDERED**.


_____
JUDITH C. HERRERA
UNITED STATES DISTRICT COURT JUDGE